The **FORSCHNER GROUP, INC.** and **Swiss Army Brands, Ltd.,** Plaintiffs–Appellees,

v.

**ARROW TRADING CO. INC.,** Defendant–Appellant.

**No. 1371, Docket 93–9155.**

United States Court of Appeals, Second Circuit.

Argued April 18, 1994.

Decided July 22, 1994.

Karen P. Clancy, New York City (Oliver P. Howes, Jr., Nims, Howes, Collison, Hansen & Lackert, of counsel), for plaintiffs-appellees.

Joseph H. Lessem, New York City (Louis S. Ederer, Paul R. Levenson, Cowan, Liebowitz & Latman, of counsel), for defendant-appellant.

Before: ALTIMARI, McLAUGHLIN and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

The phrase "Swiss Army knife" has never enjoyed trademark protection. This appeal considers chiefly whether that phrase is descriptive of geographic origin or product quality, and therefore protectible under the false advertising provision of the Lanham Act.

Victorinox Cutlery Company ("Victorinox") of Switzerland has manufactured multifunction pocketknives since 1892. Another Swiss firm, Wenger, S.A. ("Wenger"), has manufactured multifunction pocketknives since 1908. Since early in this century, these two Swiss firms have been the only purveyors of multifunction pocketknives to the Swiss Armed Forces. American soldiers returning from Europe after World War II coined the phrase Swiss Army knife to describe the intricate and ingenious pocketknives used by the Swiss military.

In 1950, plaintiff-appellee The Forschner Group, Inc. began importing pocketknives manufactured by Victorinox into the United States, and began calling them Swiss Army knives in 1958. The United States distributor of the Wenger knives, Precise Imports Corporation, is not a party to this litigation.

Early in 1992, defendant-appellant Arrow Trading Co., Inc. ("Arrow") began marketing in the United States an inexpensive and shoddy multifunction pocketknife manufactured in China. Arrow nevertheless referred to its knife as a Swiss Army knife and embossed the words "SWISS ARMY" on one side.

The Forschner Group and its subsidiary Swiss Army Brands, Ltd. (collectively "Forschner") immediately brought an action for injunctive relief against Arrow, alleging violations of § 43(a) of the Lanham Act and unfair competition under New York common law. The United States District Court for the Southern District of New York (Preska, J.), found that Arrow's use of the phrase Swiss Army knife in connection with a multifunction pocketknife that was not manufactured in Switzerland and that was not of high quality constituted a misrepresentation as to geographic origin and quality, in violation of § 43(a). The district court therefore enjoined Arrow from representing that its knife was a Swiss Army knife. We vacate the order of the district court because we hold that the phrase Swiss Army knife is neither geographically nor qualitatively descriptive, and we remand for consideration of whether Arrow's use of the phrase Swiss Army knife otherwise amounts to a violation of § 43(a) or unfair competition.

## BACKGROUND

The facts of this appeal are not in dispute and are set forth by the district court in every useful detail, *Forschner Group, Inc. v. Arrow Trading Co.*, 833 F.Supp. 385 (S.D.N.Y.1993). We recapitulate the facts that bear upon the issues decided.

The multifunction pocketknives made by Victorinox and Wenger are renowned for their quality and durability, and are the object of a mystique. As the district court stated, these knives "have taken on the qualities of legend, albeit less regal than Excalibur." *Forschner*, 833 F.Supp. at 390. Nevertheless, despite the undeniable "association between the knives, on the one hand, and Victorinox and Wenger and their distinctive histories and prominent reputations, on the other hand", *id.* at 389, no trademark exists—or has ever existed—for the phrase Swiss Army knife. The president and chief executive officer of Forschner testified to his understanding that no attempt has ever been made to register "Swiss Army" as a trademark for a multifunction pocketknife, because "[s]omeone from the company must sign a declaration that the mark is unique and not a mark used by another party." By a handshake agreement, Victorinox and Wen-

ger have agreed between themselves to share the use of the phrase: only Victorinox may call its knife the "original" Swiss Army knife, but Wenger may call its knife "genuine." Their American distributors litigated the same issue, and settled their dispute by accepting the same terms.

In January 1992, Arrow began marketing a multifunction knife manufactured in China (the "Arrow knife"). The physical appearance of this knife is similar, albeit distinguishable, from that of a Victorinox or Wenger knife. *Forschner,* 833 F.Supp. at 387–88. As to quality, the parties do not dispute that the Arrow knife is markedly inferior. Arrow itself describes its knife as "an attractive functional product.... It's not a Rolls Royce. It's a Honda Accord." The district court, having compared them closely, found that the Arrow knife was in fact more akin to a Yugo. *Id.* at 388.

The knives distributed by Forschner are distinctive because of (i) their red color, (ii) the cross-and-shield symbol that appears on one side, and (iii) the following inscription found on the tang of the main blade: VICTORINOX / SWITZERLAND / STAINLESS/ROSTFREI.

The Arrow knife, which is also red in color, contains the embossing "SWISS ARMY" on one side. Above those words is a cross-and-shield design distinguishable from the one that appears on knives distributed by Forschner. A small "TM" is placed between the cross-and-shield design and the letter "M" in "SWISS ARMY." The tang of the main blade of Arrow's knife is marked: STAINLESS/CHINA. The top of the box in which Arrow distributes its knives shows the words "SWISS ARMY" together with Arrow's cross-and-shield design. Adjacent to this design are the words: 11 FUNCTION/SWISS ARMY KNIFE. The side of the box states that "THE SWISS ARMY LOGO DESIGN IS A TRADEMARK USED UNDER LICENSE BY ARROW TRADING CO., INC. NEW YORK, N.Y. 10010, USA." Below this appear the words "Made in China."

The small "TM" on the side of Arrow's knife and the licensing statement on the box supposedly reference the cross-and-shield design, not the words "SWISS ARMY." Arrow allegedly uses the cross-and-shield design pursuant to a licensing agreement with its sister company (Colony Corporation), which has submitted a trademark application for the design.

On August 18, 1992, Forschner sent a cease and desist letter to Arrow. Forschner objected to the licensing statement that appears on the side of the box in which the Arrow knife is packaged. Since the phrase "Swiss Army" is not a registered trademark, Forschner asserted that Arrow did not (and could not) have a license to use "Swiss Army" as a trademark under license on its pocketknife. Accordingly, Forschner requested that Arrow

> stop representing that "Swiss Army" or the Swiss Army design logo used on Arrow's packaging is a trademark used by it under license; and from using the term "Swiss Army" or "Swiss Army Knife" on or in connection with the advertising, promotion, offering for sale or sale of knives not manufactured in Switzerland.

Arrow refused.

On September 22, 1992, Forschner filed a complaint in the Southern District of New York seeking to enjoin Arrow from marketing the Arrow knife as a Swiss Army knife. Although the complaint is not entirely clear, we read Count I to allege misrepresentation as to manufacturer or source under § 43(a), 15 U.S.C. § 1125(a)(1)(A) (1988), a claim which includes "passing off"; Count II to allege false advertising in respect of geographic origin and quality under § 43(a), 15 U.S.C. § 1125(a)(1)(B); and Count III to allege unfair competition under New York common law.

The proceedings in the district court focused almost exclusively on Count II, in which Forschner alleged that, with reference to a multifunction pocketknife, the phrase Swiss Army denotes a knife that is manufactured in Switzerland and that is of the same high quality as the knives produced by Victorinox and Wenger. Therefore, Forschner contended, Arrow's use of the phrase Swiss Army knife in connection with Arrow's poor-

ly-crafted Chinese-manufactured knife constitutes false advertising.

During the bench trial, Forschner and Arrow presented the results of consumer surveys prepared by their respective experts. While each party disputes the significance of the other's survey, it is sufficient for purposes of this appeal to note that (i) roughly 40% of the relevant public believes that a Swiss Army knife is manufactured in Switzerland,[1] and (ii) between 34% and 43% of the relevant public believes that the phrase Swiss Army knife denotes a knife of "high quality."

Arrow argued that this survey evidence demonstrates that a Swiss Army knife does not necessarily signify Swiss manufacture or high quality. Instead, Arrow argued that the phrase Swiss Army knife is a generic term for a multifunction pocketknife, of any quality, manufactured anywhere.

After trial, the district court made the following findings of fact:

— There is a "clear association between the term 'Swiss Army knife' and knives of high quality manufactured in Switzerland." *Forschner*, 833 F.Supp. at 390.

— "[C]onsumers perceive the [Arrow] knife to be of high quality and produced in Switzerland because Arrow represents it to be a Swiss Army knife through the use of the words 'SWISS ARMY' and the cross-and-shield design." *Id.* at 391.

— There is a likelihood that ordinary consumers will be "misled, or indeed simply confused as to the geographic origin and quality of the [Arrow] knife." *Id.*

— The Arrow knife, "whether considered alone or in its box, is perceived by the purchasing public to be a Swiss Army knife—a high-quality, Swiss-made product—which it is not." *Id.* at 392.

Thereupon, the district court enjoined Arrow from promoting or selling as a Swiss Army knife any knife that is not of Swiss manufacture and of high quality.

Arrow now appeals.

## DISCUSSION

Forschner conceded that Swiss Army knife is not a registered trademark and therefore Forschner did not (and cannot) assert exclusive use of that phrase. *Forschner*, 833 F.Supp. at 388. Instead, Forschner argued that Arrow's use of the phrase Swiss Army knife violates the false advertising provision of the Lanham Act. Based on the survey evidence it credited, the district court agreed.

We hold that Arrow's use of the phrase Swiss Army knife does not constitute false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). The phrase Swiss Army knife is not geographically descriptive such that its use in connection with a multifunction pocketknife manufactured outside Switzerland constitutes a false designation of geographic origin. This conclusion forecloses the possibility that the phrase Swiss Army knife is somehow qualitatively descriptive, since inferences as to quality are integral to geographic descriptiveness. While Victorinox and Wenger may (or may not) be able to register the phrase for trademark protection, they cannot enjoy trademark rights without registration, or enforce such rights by means of a false advertising claim. We also hold that, even if (as Arrow contends) Swiss Army knife is a generic phrase for a multifunction pocketknife, Arrow may be found to have violated 15 U.S.C. § 1125(a)(1)(A) or to have otherwise engaged in unfair trade practices by misrepresenting the manufacturer or source of its knife.

## A. 15 U.S.C. § 1125(a)(1)(B)—False Advertising

The district court classified this action "as falling within the law of unfair competition or false advertising and not trademarks," *Forschner*, 833 F.Supp. at 388, and concluded that Arrow's use of the phrase Swiss Army

---

**1.** Arrow's survey went on to report that 51% of the relevant public believes that Swiss Army knife refers simply to a type of product. However-

er, because of Arrow's improper survey methodology, this statistic was not credited by the district court. *Forschner*, 833 F.Supp. at 393–94.

knife constituted the "use[ ] in commerce" of a "false or misleading representation of fact" as to "qualities" or "geographic origin", in violation of section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)(1). That section provides [2]:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Relying on subsection (B), and survey evidence, the district court found that a Swiss Army knife is necessarily a high-quality knife manufactured in Switzerland, and therefore concluded that Arrow falsely designated the geographic origin and quality of its knife. The district court's analysis effectively affords Victorinox and Wenger trademark protection.

### 1. Geographic Origin

There is no doubt that injunctive relief under § 43(a) of the Lanham Act is appropriate if needed to protect a geographically descriptive term. The district court relied upon a series of cases so holding. *See Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746 (8th Cir.1980) (affirming injunctive relief against use of BLACK HILLS GOLD or BLACK HILLS GOLD JEWELRY by manufacturers producing jewelry outside of the Black Hills of South Dakota); *Scotch Whiskey Ass'n v. Barton Distilling Co.*, 338 F.Supp. 595 (N.D.Ill.1971), *aff'd in part, rev'd in part*, 489 F.2d 809 (7th Cir. 1973) (injunction against use of SCOTCH on whiskey not originating in Scotland); *Scotch Whiskey Ass'n v. Consolidated Distilled Prods., Inc.*, 210 U.S.P.Q. 639 (N.D.Ill.1981) (enjoining use of LOCH–A–MOOR on whiskey not produced in Scotland). In these cases and others like them, injunctive relief was granted to producers in a particular place "who asserted their right to the use of a geographical designation in a suit against other producers who did not manufacture their goods in said area but nevertheless used the geographical designation in their name or label." *Black Hills*, 633 F.2d at 750.

Questions of false designation of geographic origin are properly considered within the analytical framework used to gauge the distinctiveness of trademarks. The strongest mark (and the one most eligible for trademark protection) is an "arbitrary" coinage, with the strength of a mark declining in distinctiveness to the "suggestive", down to the "descriptive", and finally to the "generic" (the weakest and least distinctive mark). *Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162, 170 (2d Cir.1991); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). For purposes of trademark status, therefore, a phrase or term that is descriptive of the geographic origin of a product will not receive trademark protection absent proof of secondary meaning.[3] *See Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785 (5th Cir.1984) (BANK OF TEXAS descriptive); *In re Canada Dry Ginger Ale, Inc.*, 86 F.2d

---

**2.** In 1992, the contents of former sections (1) and (2) of § 43(a) of the Lanham Act were redistributed into subsections (A) and (B).

**3.** A geographically descriptive term acquires secondary meaning when consumers come to associate that term with one particular source and quality: "[G]eographical names often acquire a secondary signification indicative not only of the place of manufacture or production, but of the name of the manufacturer or producer and the excellence of the thing manufactured or produced." *La Republique Francaise v. Saratoga Vichy Spring Co.*, 191 U.S. 427, 435, 24 S.Ct. 145, 146, 48 L.Ed. 247 (1903).

830 (C.C.P.A.1936) (map of Canada geographically descriptive); *Warwood v. Hubbard*, 218 Mont. 438, 709 P.2d 637 (1985) (YELLOWSTONE OUTFITTERS descriptive). Conversely, a geographic term may enjoy trademark protection without a showing of secondary meaning when it is used in an arbitrary or suggestive manner, taking into account the nature of the goods or services at issue. *See Hamilton–Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 256, 36 S.Ct. 269, 270, 60 L.Ed. 629 (1916) (AMERICAN GIRL not a geographic term); *Spice Islands Co. v. Spice Land Products, Inc.*, 262 F.2d 356, 356–57 (2d Cir.1959) (SPICE ISLANDS not a geographic term); *National Lead Co. v. Wolfe*, 223 F.2d 195, 200 (9th Cir.) (DUTCH and DUTCH BOY on paint arbitrary or suggestive), *cert. denied*, 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955); *Health Indus., Inc. v. European Health Spas*, 489 F.Supp. 860, 868 (D.S.C.1980) (EUROPEAN on health club); *Mem Co. v. Hes Co.*, 149 U.S.P.Q. 8, 9 (S.D.Cal.1966) (ENGLISH LEATHER for men's toiletries).

 Under the false advertising provision of the Lanham Act, a phrase is eligible for protection as a representation of geographic origin only if the phrase is geographically descriptive (*i.e.*, Swiss watches, Idaho potatoes). *See Black Hills*, 633 F.2d at 750. Once it is determined that a phrase or term denotes geographic origin, the critical inquiry becomes the one conducted by the district court: whether or not it is used in a deceptive manner so as to create a "likelihood of confusion" concerning the geographic origin of a product. *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 597 (4th Cir.) ("likelihood of confusion" test applies to claims of deceptive use under § 43(a) of the Lanham Act), *cert. denied*, ── U.S. ──, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992). In applying the "likelihood of confusion" test, a court may rely upon its own observations and other evidence, including survey evidence, as may be required. But the distinct issue of whether or not a phrase lends itself to being construed as a statement of geographic origin can be determined without reference to evidence of consumer confusion or lack thereof. *See Hamilton–Brown Shoe Co.*, 240 U.S. at 256, 36 S.Ct. at 270 (the term THE AMERICAN GIRL held not to be "a geographical or descriptive term" without reference to survey evidence); *In re International Minerals & Chemical Corp.*, 147 U.S.P.Q. 262, 262 (T.T.A.B.1965) (KENTUCKY TURF on fertilizer not primarily geographically descriptive); *McCormick & Co. v. Granny Goose Foods*, 144 U.S.P.Q. 449, 450 (T.T.A.B. 1964) (GOLDEN WEST "does not appear to have any specific geographic meaning").

In *Scotch Whisky Ass'n v. Majestic Distilling Co.*, an American company sought trademark protection for a label bearing (i) the words BLACK WATCH, which is the name of a Scottish infantry regiment, (ii) a military regimental badge substantially identical to the badge of the Black Watch Regiment of Scotland, (iii) a thistle (which is the national symbol of Scotland), and (iv) the word "Highlander". 958 F.2d at 595. The Scotch Whisky Association ("SWA")[4] filed an opposition proceeding with the Trademark Trial and Appeal Board (the "Board"), claiming that use of the label in connection with liquor products that do not originate in Scotland would deceive consumers as to geographic origin. The Board dismissed the SWA's opposition on the ground that the term BLACK WATCH was not a geographic place-name and was therefore "legally incapable" of being geographically misdescriptive. *Majestic Distilling*, 958 F.2d at 596. The SWA challenged the Board's administrative decision in the district court, which upheld the Board's decision because the SWA presented no evidence that BLACK WATCH products would create a likelihood of public confusion in respect of geographic origin. On appeal, the Fourth Circuit revisited the issue of "likelihood of confusion" and, finding none, affirmed. By footnote, the Court stated that the absence of public confusion obviated the need to address the manufacturer's argument that, "as a matter of law, terms which are not geographic places cannot be

---

4. The Scotch Whisky Association "is a United Kingdom association of Scotch whisky distillers organized to promote interest in, and trade in, whisky produced in Scotland." *Majestic Distilling*, 958 F.2d at 595 n. 2.

geographically deceptive." *Majestic Distilling,* 958 F.2d at 596 n. 7.

■ That argument is squarely presented here. Forschner's survey evidence suggests—and the district court has found—that Arrow's use of the phrase Swiss Army knife is likely to cause consumer confusion as to the geographic origin of Arrow's knife. The survey evidence and the district court's factual finding notwithstanding, Arrow argues that the phrase Swiss Army knife is not a geographic designation and therefore cannot be deceptive as to geographic origin under § 43(a) of the Lanham Act. We agree. The phrase Swiss Army knife cannot fairly be read to say "made in Switzerland" so as to be geographically descriptive. Therefore, the use of the phrase by the distributor of a knife made in China does not constitute false advertising.

A geographically descriptive term or phrase is one that "designates geographical location and would tend to be regarded by buyers as descriptive of the geographic location of origin of the goods or services." 1 J.T. McCarthy, *Trademarks and Unfair Competition,* § 14.02. That a phrase or term *evokes* geographic associations does not, standing alone, support a finding of geographic descriptiveness.[5] The phrase or term must also "designate geographical location." Therefore, even assuming (as the district court found) that consumers would tend to regard a Swiss Army knife as one originating in Switzerland, the phrase Swiss Army knife is not geographically descriptive within the meaning of the Lanham Act unless the phrase, considered as a whole, is a designation of geographic origin. *See California Cooler, Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1455 (9th Cir.1985) (composite phrase must be viewed as a whole; "its validity is not judged by an examination of its parts."); *see also Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 379 (7th Cir.) ("Words which could not individually become a trademark may become one when taken togeth-

er."), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

Our analysis is guided by the Supreme Court's decision in *Hamilton–Brown Shoe Co.,* which held that the use of the phrase THE AMERICAN GIRL on shoes manufactured in America was not geographically descriptive and was for that reason eligible for trademark protection without proof of secondary meaning:

> We do not regard the words "The American Girl," adopted and employed by complainant in connection with shoes of its manufacture, as being a geographical or descriptive term. It does not signify that the shoes are manufactured in America, or intended to be sold or used in America, nor does it indicate the quality or characteristics of the shoes.

240 U.S. at 256, 36 S.Ct. at 270. The Court distinguished prior cases finding LACKAWANNA coal, COLUMBIA flour, and ELGIN watches to be geographically descriptive by noting that "[i]f the mark here in controversy were 'American Shoes,' these cases would be quite in point." 240 U.S. at 257, 36 S.Ct. at 271.

■ Without deciding the unpresented issue of whether or not the phrase Swiss Army knife could have been exclusively appropriated as a trademark for a multifunction pocketknife if such an application had been made, we think it is clear that the phrase cannot be deemed a designation of geographic origin. If Victorinox or Wenger promoted a product as a "Swiss pocketknife," the word "Swiss" could be said to denote geographic origin. We cannot, however, consider the word "Swiss" otherwise than as part of the phrase "Swiss Army." The fact that a composite phrase contains a geographic term does not necessarily mean that the phrase, viewed as a whole, is a geographic designation. The question is whether *the phrase* can be construed to mean that the product is made in a certain locale. *Compare Canada Dry Ginger Ale, Inc. v. Lipsey,* 102 U.S.P.Q. 447, 448 (Comm'r of Patents 1954) (ROYAL CANA-

---

5. Conversely, a phrase or term that is merely evocative of a particular geographic origin *is* eligible for trademark status, even without proof of secondary meaning. *See Hamilton–Brown Shoe Co.,* 240 U.S. at 256, 36 S.Ct. at 270 (AMERICAN GIRL); *Spice Islands Co.,* 262 F.2d at 356–57 (SPICE ISLANDS).

DIAN on soft drinks is not primarily geographical for trademark purposes because the term signifies the Northwest Mounted Police, a military unit) *with Singer Mfg. Co. v. Birginal–Bigsby Corp.*, 319 F.2d 273, 275 (C.C.P.A.1963) (AMERICAN BEAUTY on sewing machines is geographically descriptive because the term could be construed to mean an object of superior quality made in America).

As used in the phrase Swiss Army knife, "Swiss" is read more naturally to modify "Army" than "knife"—and probably does. The phrase Swiss Army knife therefore denotes a knife of the type associated with the Swiss Army, rather than a military knife manufactured in Switzerland. The district court's findings support the view that "Swiss" modifies "Army" rather than "knife":

— [T]he history of Swiss Army knives relates in part to the Swiss military, and American soldiers obviously drew a connection with the Swiss military when they began employing the name "Swiss Army knife."

— [T]he Swiss military's purchase of the knives has been a continuous boost to [the knives'] stature. This well-honed reputation seems to have been captured in the United States by the term "Swiss Army knife" when the knives gained renown upon the return of American soldiers from World War II.

*Forschner*, 833 F.Supp. at 398, 389. Similarly, in discounting the methodology of Arrow's survey, the district court criticized Arrow's use of the word "Swiss" in isolation as an improper "dissection of the term 'Swiss Army knife.'" *Forschner*, 833 F.Supp. at 395.

The geographic origin cases relied upon by the district court are consistent with our analysis. In each of those cases, the word or words that modified the product could be (though need not be) construed to represent the product's geographic origin. *See, e.g., Black Hills*, 633 F.2d at 752 (BLACK HILLS gold jewelry); *Scotch Whiskey Ass'n v. Barton Distilling Co.*, 338 F.Supp. at 598–99 (SCOTCH whiskey). Even *Scotch Whiskey Ass'n v. Consolidated Distilled Prods., Inc.* falls within this framework. In that case, the district court found that the term LOCH–A–MOOR was geographically descriptive because it included the topographical term "loch" (the Scottish word for "lake") and the topographical term "moor" (the British word for certain open tracts of land), and because the label stated that the whiskey was derived from an old "Isle of Skye" recipe. Therefore, while Loch–A–Moor is not a geographical place-name, it nevertheless gives the impression of being one. The same cannot be said of "Swiss Army."

For these reasons, we hold that the phrase Swiss Army knife, as applied to a multifunction pocketknife manufactured outside Switzerland, is not a false designation of geographic origin.

### 2. Quality

■ The district court held that Arrow's reference to its knife as a Swiss Army knife constitutes a misrepresentation of quality because a Swiss Army knife is necessarily one of high quality. This conclusion is in one sense a near-corollary of the district court's holding that the phrase is geographically descriptive. Ordinarily, the reason that manufacturers promote and protect a geographical designation is because the origin assures in some measure qualities that the buying public has learned to value: the characteristics of agricultural products or ingredients; the techniques of artisans or designers; or the reputation and cachet of the producers in that place. *See California Apparel Creators v. Wieder of California, Inc.*, 162 F.2d 893, 898 (2d Cir.) ("actions have been held maintainable for misrepresentation by appropriation of geographical names where products of the soil of certain localities were, because of climatic or other natural advantages, superior to similar products of other localities, or where producers of a particular region, using a peculiar patent or other special process, have produced a product of a single quality whose superiority is generally recognized") (citations omitted), *cert. denied*, 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393 (1947); *see also* 1 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 14.09 (in cases involving false designation of geographic origin, plaintiffs usually "were required to show

that their geographical area produced goods of superior quality due to a special soil, climate, reputation, etc").

However, since we have held that the phrase Swiss Army knife is not geographically descriptive, use of the phrase cannot be deemed a representation of high quality solely because consumers associate high quality with Swiss companies and Swiss craftsmen. Nor can the term be deemed a representation of high quality solely because Victorinox and Wenger produce high quality pocketknives, since that circular analysis would effectively confer upon Victorinox and Wenger a species of trademark protection conditioned upon the maintenance of their quality controls. Moreover, the record does not disclose any system of grade, standard, or regulation employed as a touchstone for the quality of multifunction pocketknives, in Switzerland or elsewhere. *See California Apparel,* 162 F.2d at 901 (no misrepresentation as to geographic origin and quality in "the absence of any general and definite standards of quality").

Forschner suggests that a standard of quality is implicit in Victorinox's status as a purveyor to the Swiss Armed Forces, and that Arrow's use of the phrase Swiss Army knife therefore constitutes a misrepresentation of quality. This line of analysis is unworkable. First, since only Victorinox and Wenger sell to the Swiss military, the phrase Swiss Army knife would not be available to any other company, even a Swiss manufacturer employing the utmost standards of quality. Second, "[a]lthough Victorinox and Wenger produce a panoply of pocketknives, the Swiss military purchases only a relatively basic model...." *Forschner,* 833 F.Supp. at 387. Since only this one model can be said to have satisfied the Swiss military's standard of quality, it is not clear that any other model produced by Victorinox or Wenger would qualify as a Swiss Army knife. Third, if the Swiss military were to economize by purchasing Arrow pocketknives, Victorinox and Wenger could no longer call their own products Swiss Army knives. In any event, this line of argument appears to be foreclosed by the district court's findings: "[T]he Court does not find adequate support in the evidence for Forschner's argument that consumers be-

lieve that Swiss Army knives are distributed by a purveyor to the Swiss military." *Forschner,* 833 F.Supp. at 392 n. 6. The phrase Swiss Army knife therefore does not in itself convey the idea that Victorinox and Wenger are the only purveyors of multifunction pocketknives to the Swiss military, although that idea presumably could be set forth expressly in the way that many products boast the patronage of exacting customers or royalty, or possibly by a certification mark procured by the Swiss Armed Forces itself. *See* 15 U.S.C. § 1127.

The assurance of quality found by the district court to inhere in the phrase Swiss Army knife is purely a function of what the district court deemed to be the geographical descriptiveness of that phrase, and does not furnish an independent ground for false advertising liability under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

**B. 15 U.S.C. § 1125(a)(1)(A)—Passing Off**

Arrow argues that if the phrase Swiss Army knife is not geographically descriptive, it is nothing more than a generic phrase denoting any multifunction pocketknife. A generic phrase, Arrow continues, is in the public domain for all to use. Accordingly, Arrow urges that we direct the district court to dismiss the complaint if we conclude—as we do—that the phrase Swiss Army knife is not geographically descriptive. We are not prepared to do so.

A phrase or term that is not geographically descriptive is not necessarily generic. Moreover, a phrase or term that is indeed generic is not without protection under § 43(a) of the Lanham Act and New York common law. A judicial finding of genericness means only that courts will not recognize exclusive rights in the use of the generic phrase or term or impose trademark infringement liability upon subsequent users; such a finding does not close all avenues of relief. A manufacturer, for example, cannot use a generic term in a manner that constitutes a misrepresentation of manufacturer or source. *See Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 114, 59 S.Ct. 109, 111, 83 L.Ed. 73 (1938); *Murphy Door Bed Co. v. Interior Sleep Systems, Inc.,* 874 F.2d 95, 102

(2d Cir.1989). Therefore, even if we assume (as Arrow contends) that the phrase Swiss Army knife is generic, Arrow may still have violated § 43(a) of the Lanham Act or otherwise engaged in unfair competition.

 "A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie & Fitch*, 537 F.2d at 9. It is true, as Arrow notes, that generic names are not entitled to trademark protection. *See Kellogg*, 305 U.S. at 112–113, 59 S.Ct. at 111. Nor is any one manufacturer entitled to the exclusive use of a generic name: "If the name of one manufacturer's product is generic, a competitor's use of that name, without more, does not give rise to an unfair competition claim under section 43(a) of the Lanham Act." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1043 (D.C.Cir.1989).

 Forschner, however, is not seeking trademark protection for the phrase Swiss Army knife. Count I of Forschner's complaint points to Arrow's claim that it was using "Swiss Army" as a trademark under license and alleges that this "is likely to cause consumers and the trade to believe that defendant's knives are put out by, sponsored by or sold with the approval and/or authorization of a distributor of authentic Swiss made Swiss Army knives", in violation of § 43(a) of the Lanham Act. Count III of the complaint alleges that "[t]he activities of [Arrow] and the dress of the knives offered by [Arrow] unfairly compete with Forschner and ... are part of a plan by defendant to trade upon the goodwill and enviable reputation of Forschner and the authentic Swiss Army knives imported, sold and promoted by Forschner," in violation of New York common law. The district court had no occasion to address these causes of action, having determined that Forschner was entitled to relief on the false advertising claim asserted in Count II. Counts I and III, however, identify a separate danger—that consumers might mistake the Arrow knife for a multifunction pocketknife *manufactured by Victorinox or Wenger*. If there is a sufficient factual predicate for this allegation, injunc-tive relief is warranted irrespective of whether the phrase Swiss Army knife is generic.

Our determination that Arrow did not misrepresent the geographic origin or quality of its knife does not absolve Arrow of liability for other forms of misrepresentation or unfair competition, such as passing off: "The statutory prohibition against false designation of origin encompasses more than deceptions as to geographic origin; it extends, as well, to origin of source, sponsorship or affiliation." *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 639 (1st Cir.1992) (citation omitted). The language of subsection (A) of 15 U.S.C. § 1125(a)(1) prohibits any misrepresentation likely to cause confusion as to the source or manufacturer of a product: "The use of a product or package design that is so similar to that of another producer that it is likely to confuse purchasers as to the product's source may constitute 'false designation of origin' within the meaning of [§ 43(a) of the Lanham] Act." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 863, 102 S.Ct. 2182, 2193, 72 L.Ed.2d 606 (1982). This type of false designation of origin is also actionable under the broad heading of unfair competition. *See American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 662 (2d Cir.1979) (unfair competition may consist of "confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor"), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *see also Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939 (7th Cir.1986) (unfair competition claim "might be supportable if consumer confusion or a likelihood of consumer confusion arose from the failure of the defendant to adequately identify itself as the source of the product"); *Metric & Multistandard Components Corp. v. Metric's, Inc.*, 635 F.2d 710, 714 (8th Cir. 1980) ("If the plaintiff can establish that use of its mark by a competitor constitutes such a false designation of origin or false representation and if the public is likely to be confused by that use, the plaintiff is entitled to protection under section 43(a) of the Lanham Act."). Regardless of whether a term is trademarked, a plaintiff may show that the term name is so associated with its goods

that "use of the same or similar [term] by another company constitutes a representation that its goods come from the same source." *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 147 (2d Cir.1956); *see also* Restatement (Third) of Unfair Competition § 15, comment d (Tentative Draft No. 2, 1990) (use of a generic name in a way that misrepresents its nature or source is actionable).

Courts typically grant relief, injunctive or otherwise, for misrepresentations as to the source of a product where a formerly exclusive trademark is no longer protectible because it has become generic. *See, e.g., Murphy Door Bed*, 874 F.2d at 102 (misleading consumers as to source of product marketed under former trademark "Murphy Bed"); *King–Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577, 581 (2d Cir.1963) (enjoining deceptive use of former trademark "thermos"). However, as the Supreme Court's decision in *Kellogg Co. v. National Biscuit Co.* demonstrates, relief is also available when the misrepresentation of source arises through the use of a phrase (like Swiss Army knife) that is generic *ab initio*.

In *Kellogg*, the National Biscuit Company sought to enjoin the Kellogg Company from using the term "shredded wheat." The Supreme Court found that "shredded wheat" is generic and that the National Biscuit Company therefore did not have an exclusive right to use it. Nevertheless, since the National Biscuit Company had historically been the sole manufacturer of shredded wheat, there was an undeniable association in the public mind between that company and the term "shredded wheat." Accordingly, the Court recognized an obligation on the part of the Kellogg Company and other subsequent users "to use every reasonable means to prevent confusion," although not to the point of refraining from use. *Kellogg*, 305 U.S. at 115, 59 S.Ct. at 112.

The District of Columbia Circuit has summarized the *Kellogg* limitations on the use of generic terms, with emphasis on efforts by competitors to stimulate confusion or benefit from it:

> If a consumer confuses two manufacturers' shredded wheat cereal, for example, because both products share the same name and the consumer has a general appetite for crunchy, pillow-shaped wheat biscuits, there is no cause for judicial action. Such confusion results merely from the manufacturers' concurrent use of a generic term to designate their products, and the late entrant into the shredded wheat field cannot be said to have engaged in unfair competition. If, however, the consumer associates "shredded wheat" with a particular manufacturer, perhaps because that manufacturer enjoyed a de facto (or de jure) monopoly for many years, there is a risk that the consumer may erroneously assume that any product entitled "shredded wheat" comes from that manufacturer. *A second manufacturer may increase the risk of confusion by, for example, using a similar label, similar packaging, misleading advertisements, or simply by failing to state the product's source. Only when there is a likelihood that the newcomer might thus pass its product off as the original manufacturer's may a court require the newcomer to distinguish its product or to notify consumers explicitly that its product does not come from the original manufacturer.*

*Blinded Veterans Ass'n*, 872 F.2d at 1045 (emphasis added).

Assuming, arguendo, that the phrase Swiss Army knife is generic, *Kellogg* governs. A manufacturer such as Arrow cannot be prevented from using the phrase to denote its product. *See Liquid Controls Corp.*, 802 F.2d at 940 (judicial concern "directed towards passing off, not confusion generated by the mere similarity of names"). The district court, however, found that the phrase Swiss Army knife has come to be associated with two particular manufacturers. *Forschner*, 833 F.Supp. at 389 (there is a long-standing "association between [Swiss Army] knives, on the one hand, and Victorinox and Wenger and their distinctive histories and prominent reputations, on the other hand"). This finding is buttressed by the fact that we read the phrase Swiss Army knife as referring not to a military knife manufactured in Switzerland, but to a product used by the Swiss Army. Since Victorinox and Wenger

are the only manufacturers who sell pocketknives to the Swiss Army, there is reason to associate the phrase Swiss Army knife with those two companies. Accordingly, Arrow must take "every reasonable precaution" to distinguish its Swiss Army knife from the Swiss Army knives produced by Victorinox and Wenger. *Kellogg,* 305 U.S. at 122, 59 S.Ct. at 115.

Arrow's use of the phrase Swiss Army knife is permissible only to the extent that such use does not engender a likelihood of confusion as to the source of Arrow's product. *See Liquid Controls Corp.,* 802 F.2d at 939 (claim for unfair competition may lie "if consumer confusion or a likelihood of consumer confusion arose from the failure of the defendant to adequately identify itself as the source of the product"); *Metric & Multistandard,* 635 F.2d at 714 (claim for unfair competition where defendant's catalogues "were nearly exact copies of [plaintiff's] sales materials"); *New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion'?"). If Arrow wishes to market a Swiss Army knife, it may do so only in a manner that would not mislead the public into believing the knife was manufactured by Victorinox or Wenger.

Since the district court did not address the claims of misrepresentation of source or unfair competition alleged in Counts I and III, respectively, we remand for consideration of whether or not Forschner has abandoned those claims and, if not, whether Forschner is entitled to relief under § 1125(a)(1)(A) or New York common law.

## CONCLUSION

For the reasons set forth above, we vacate the order of the district court and remand for further proceedings consistent with this opinion.